Filed 6/5/26  In re C.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re C.B. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E087200 |
| Plaintiff and Respondent, | (Super.Ct.No. DPIN2400084) |
| v. | OPINION |
| K.K., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Susanne S. Cho, Judge.

Affirmed.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Jamila T. Purnell, Assistant County Counsel, and Julie Jarvi, Deputy County Counsel for Plaintiff and Respondent.

In this dependency case, a father appeals the termination of his reunification services at the 12-month review hearing. He argues no substantial evidence supports three findings underlying that order: that returning his four daughters to his care would create a substantial risk of detriment, that he was provided with reasonable services, and that there was no reasonable probability the children would be returned if the matter was continued to the 18-month review hearing. We affirm.[1]

## I.  FACTS

Defendant and appellant K.K. (father) has four daughters—C.B. (born 2014), R.K. (born 2017), A.K. (born 2018), and V.K. (born 2020)—with their mother M.B. (mother).[2] Mother also has a son, Z.B. (born 2023), with a different man. According to father, only after Z.B. was born did he learn he was not the boy's father, and after attempts to "work things out" with mother were unsuccessful, he moved out of the family home.

In March 2024, the five children resided with mother. Plaintiff and respondent Riverside County Department of Public Social Services (the department) responded to a report that the maternal grandfather had sexually abused C.B. That alleged abuse was committed after mother allowed the maternal grandfather to stay with the family temporarily even though she knew he was a registered sex offender and had a history of

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Father is C.B's biological father, but he was not on the birth certificate or present for her birth because mother (born 1998) was a minor at the time and father was an adult (born 1991). He was present for the births of their other children, he is on their birth certificates, and he was living with mother at the time of their births.

substance abuse. The department also learned that mother had been leaving the children at home alone without any adult supervision, and there were concerns about mother's own substance abuse and mental health. A social worker who visited the home found it "was messy and smelled musty." The children were "disheveled, but without any marks or bruises."

The department contacted father, who was living in Nevada. He said he was willing to care for his children, but he was unemployed and his living arrangement, renting a room, meant he lacked space for them. He said he had maintained communication with the children through video chat, but had not seen them in person since October 2023. He admitted to a "criminal history nine years ago [for] 'weed' possession and being with the mother when she was underage." He and mother engaged in verbal domestic violence with one another near the end of their relationship.

Mother had told father about C.B. being sexually abused by the maternal grandfather, and he knew that police were involved. He said he had not known that maternal grandfather was a registered sex offender. When asked about mother leaving the children home unsupervised, he "indicated he was not surprised." He said that when he was living with mother, and even after he moved out, C.B. would call him when mother would leave her home alone with the other children, and he would "rush home." The last time C.B. had told him about being home unsupervised with the other children was in November 2023 "when she had her own phone"; now his only communication with the children is "with [] mother present." He said he tried to contact law enforcement

about the children being left alone, but got "no help." He said that C.B. had told him that mother "would be gone for hours and it happens at least three to four times a week." Father was concerned that alcohol "gets the best of" mother. He said he would like help with housing so "he could better care for the children."

The department filed a dependency petition as to all five children on April 18, 2024, but did not immediately detain them out of mother's care. About two weeks later, however, the department filed an amended petition, took the children into protective custody, and placed them in foster care, after a report that mother again left the children unsupervised and that she had hit R.K. with a belt, causing marks.[3] At the detention hearing in May 2024, the juvenile court detained the children. It found father was the presumed parent of the four older children.

The department's investigation of father's criminal history showed he had previously been required to register as a sex offender under Penal Code section 290. He had been free of that requirement under California law since December 2019, but he "may be required to register in other jurisdictions."

The two oldest children recalled witnessing domestic violence between mother and father. When the social worker asked C.B. to describe father, she said he is "'really nice but plays too rough sometimes.'" When asked to explain what that meant, she said "we just mess around too much," and did not elaborate further. C.B. also said she would

---

[3] The dependency petition would be amended twice more before the jurisdiction hearing. For our purposes, it is unnecessary to track the changes made by these amendments.

tell father what was happening at home when they talked on the phone, but "they did not always talk."

Father told a social worker he knew mother was leaving the children alone and she was using cocaine and alcohol. He said that he knew about the lack of supervision by February 2024, because the children would tell him two or three times a week that they were alone. He would tell them to go to a neighbor's house. Father expressed his belief the children should be placed in his care because the children had been removed because of mother's mistakes, and he did not feel he had done anything wrong.

In June 2024, father moved to North Dakota. He provided the department his new address.

In July 2024, the children's caregiver called the social worker about an "ongoing Zoom visit" between father and the children, during which father was "screaming" at her, and telling the children that the caregiver had "kidnapped" them so they "are allowed to misbehave." When the social worker called father, he "continued to yell," saying that his rights were being infringed and that he would be suing her "due to kidnapping his children." Father followed up this phone call with text messages in the same vein.

Later that month, mother was sober, having recently checked into an in-patient treatment program, and she "felt inclined to share information" about father. She said father would slap the children across the head when he became mad, that he has threatened to kill himself, and that he blames her for the children being removed from

their care.  She said that when she and father lived together, he did not care for the children.

At a July 2024 hearing, the department requested an order authorizing it to obtain C.B.'s birth certificate from the appropriate Nevada agency, which the court provided orally and in a minute order.

At the August 2024 jurisdiction hearing, the juvenile court sustained the operative third amended dependency petition, removed the children from parental care, and ordered reunification services for both mother and father.  The allegations sustained against father were under section 300, subdivision (b)(1) (failure to protect): "[Father] knew or reasonably should have known the children's health and safety were being neglected while in the care of the mother.  The father admitted knowing of the mother's substance abuse issues, the poor living conditions of the home, and the children being left unattended. The father failed to take protective measures or actions to protect the children, leaving them at continued substantial risk of physical harm."  At the same hearing, father's counsel raised the issue that the department had not yet provided father with his children's birth certificates.  The court confirmed that the department had been ordered to provide father with the birth certificates, and it should do so.

Also in August 2024, a social worker contacted the county "Human Service Zone" of the North Dakota county where father lived, and relayed to father information about available services.  Father responded with an email telling the social worker that the services provided included housing services if he could get the birth certificates of the

6

children.  In September 2024, after learning the court's previous minute order regarding C.B.'s birth certificate did not "suffice when ordering a birth certificate from the state of Nevada," the department made an ex parte request for the necessary order, which the court signed.

In its February 2025 six-month review report, the department said father was employed in North Dakota and had recently been promoted.  He was involved in a romantic relationship, though he did not want to disclose his girlfriend's name.  After some delays, father had completed the parenting classes required by his case plan in January 2025.  The department referred father to resources for completing the general counseling services required by his case plan.  He visited with the children by Zoom, supervised by their caregiver.  The caregiver told the department that in the beginning father had been rude to her, but he had changed his behavior and had consistently visited.  Father had "completed promises for his children and delivered birthday and Christmas presents."  At father's request, his visits were changed from twice a week to once a week on the weekend to accommodate his work schedule, which had caused him to miss several visits in January and February 2025.

In February 2025, the juvenile court ordered an evaluation under the Interstate Compact on the Placement of Children (ICPC) for placing the children with father in North Dakota.  That evaluation was completed in May 2025, with the North Dakota agency indicating it was willing to approve the home study, but it recommended further investigation of father's criminal history by the department before placement.  His

background check had come back as denied due to previous charges in another state, which father attributed to "assault/weapon charges over 10 years ago." The North Dakota agency recommended the department "gather more specific information on his charges to make a determination if the children can move." The department would need to "maintain custody for at least 6 months to monitor the transition."

According to the department's June 2025 12-month review report, father continued to be employed in the same position, living in North Dakota. The only person he identified as his support system was his girlfriend, who he said lived in the same apartment complex. The report says father was renting a bedroom in an apartment from a friend. Father later testified, however, that this was a misunderstanding; the two-bedroom apartment was his, and he had rented a room out to "somebody else" for a time, so that he "would have extra money to buy furniture, such as bunk beds, clothes, nightstands, things for my kids." Father's account is supported by the ICPC home study, which describes father as living in a two-bedroom apartment, with a mattress on the floor of one bedroom where father slept, and two sets of twin-sized bunk beds in the other bedroom.

In April 2025, per his case plan, father completed an intake for general counseling. Father continued to fail to "understand why the service objectives in his case plan were assigned as he does not feel responsible for the open dependency." He nevertheless participated "for family reunification purposes." The provider concluded there were "no

medically necessary services" recommended, but father "should consider family therapy to assist with transition, communication, and healthy boundaries."

On June 11, 2025, father told the social worker he was going to visit California from June 14 to June 22. The social worker scheduled two visits for father, on June 17 and June 20. Father initially told the social worker that both dates were unacceptable because he was going to attend a "surfing event" on June 17 and he was going to visit his grandmother on June 20. Father became "verbally challenging," expressing that he did not understand why he could not have unsupervised visits and visits on the weekend and threatening to return to North Dakota without seeing the children at all if he did not get unsupervised visits. After an hour of the social worker explaining that the visits had to be supervised because this was father's first in-person visit, and that the department was closed and therefore unable to supervise visits on the weekend, father agreed to a supervised visit with the children on June 20. The visit, at a restaurant with a play area, went well.

At a hearing on June 18, 2025, the court granted father's request for housing referrals, ordering that if he qualifies he receive "$3,500 in first month's or deposit and also other housing referrals that are nonmonetary referrals." The court authorized "liberalized visitation coordinated through [the department] and in agreement with the caregiver," but reaffirmed that visitation was to be supervised to start.

On June 23, 2025, father told the social worker he would be moving to California. Because father moved to California, the ICPC referral was withdrawn.

9

Father planned to stay with his father (paternal grandfather) temporarily after moving to California, but he did not consider paternal grandfather part of his support system. And, indeed, he does not appear to have stayed there long, as on July 3, 2025, father asked the social worker not to send a reimbursement check to the paternal grandfather's address because "his grandma and his father were telling him that they would send it back and that [father] was not to contact them." Father got a job in California and told the social worker he was looking for housing. On several occasions, the social worker explained to father how the housing assistance referral system worked.[4] In July 2025, the department submitted a referral for father to a housing assistance voucher program. On July 28, 2025, however, the social worker learned that father did not qualify for that program. On August 6, 2025, the department submitted a referral to another housing assistance program.

At an August 21, 2025 hearing, the social worker told the juvenile court she had no concerns about father starting unsupervised visits. Father had tested negative for drugs, he had attended the general counseling intake, he was employed, and there had been no concerns about his in-person visits with the children in July. The court ordered father to have weekly unsupervised visits.

---

[4] The department does not "do referrals for specific housing." It could refer father "to see if he qualifies" for housing assistance programs. Even when the referral is made, however, "funds are not always available." When funds are available and once the assistance is approved, it can be paid directly to the landlord to cover a deposit or first month's rent. Or, if father paid "out of pocket," he could be reimbursed after a review and approval.

In September 2025, the department reported father had been laid off from his job. He had found a new job, but it was only part time and he was "lucky if he gets 8 hours a week." He was supplementing that work with "small remodeling jobs" and making deliveries. The housing assistance program was "in contact" with father and "attempting to help him find housing." He said he was having trouble with finding anything because landlords "want proof of income 2 to 3 times the rent" and he did not have that. Father told the social worker that if he had approval he could get his old job and apartment in North Dakota back again, and the bunkbeds for the girls were in storage. He was afraid he was going to lose his children because he cannot afford to live in California.

In August and September 2025, father had unsupervised visits with the children five times. The visits generally went well; the children said they had fun and enjoyed spending time with father. The caregiver reported, however, that the children's behavior deteriorated after in-person visits with father began, to the point that "they are not following any rules or direction." The children told her that father would talk to them about the dependency case and would ask them about the caregiver. In the same time period, the department had opened an "out of home investigation" based on allegations by the children against the caregiver. The caregiver reported that father had the children make a "false statement" to the social worker, and that C.B. had come to her and said "she is sorry that she made up the story because she thought that she would be able to go live with her dad."

The department's September 2025 recommendation was that the juvenile court terminate father's reunification services. It did not recommend that a section 366.26 hearing be set immediately, as its investigation of the allegations against the caregiver was still ongoing.

The department acknowledged father's "efforts to reunify with his children, as well as the bond he has with them." But it was only near the end of the 12-month review period that father moved to California and began in-person visits. Those visits were limited to weekends due to father's work schedule, which the department found "concerning as to [father's] parenting capabilities" and his ability to manage "the children's school, services, medical and dental appointments, and being able to care for them." Father also did not "have any support in California that can assist him with his children." He had not been able to progress to overnight or weekend visits with the children because he had not been able to identify a "stable home" where such extended visits could be conducted, despite the housing referrals he had been provided and the limited "family and friend support" he reported.[5]

---

[5] Father sometimes identified paternal grandfather as someone who "would be willing to help as needed," but father also said that paternal grandfather would not accept a check being mailed to father, and that paternal grandfather had told father not to contact him. Father also said two "friends," identified only by first name, were his support system; "Samantha," who used to babysit the children, and "Rietta," who was "going to school to be an art teacher" and had "offered her help and support also." The department apparently was unable to verify that these sources of support would be adequate, particularly given that the four children "require a lot of attention and mental health services."

12

At the September 29, 2025 12-month review hearing, father testified that he could get back his apartment in North Dakota and set up the children's room again "easily." He also said his "old job" was still "waiting" for him there, and that he has a "support group" there. He said the "only thing stopping me is they want me do it here, and just, you know, economically, I can't with the way California is right now."

The juvenile court accepted the department's recommendation to terminate father's reunification services. The court acknowledged that father "loves his children," that the children were "obviously . . . very bonded with their father." The court also recognized that father's inability to obtain stable housing in California had been an obstacle to reunification, hypothesizing during argument that if "he just had a nice four-bedroom house, things would be a lot different today." The court found that father was "not in a position to, basically, take care of [the children] full-time or have them placed legally at this point, financially too, but legally, in terms of a legal standard." It had considered extending services to the 18-month mark, but that deadline was only a month away, on October 30, 2025, and that was "not enough time to address the issues." The court did not immediately set a section 366.26 hearing, ordering the department to complete its investigation of the allegations against the caregiver "as soon as possible so that we can resolve the issues that are holding up the permanency plan in this case."

## II. DISCUSSION

*A. Detriment Finding*

Father's argument that the juvenile court's detriment finding lacks the support of substantial evidence rests on the premise that "the record is devoid of evidence that, but for his inability to afford housing in California that would accommodate him and his children, Father was incapable of safely parenting his children." We view the record differently.

At a 12-month review hearing a juvenile court must return the child "unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) We review a court's finding of detriment for substantial evidence. (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864.) "Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Id.* at p. 865.)

The jurisdictional allegations sustained against father are based on his failure to protect his children, despite knowing they were being neglected by mother, both while he was living with mother and the children and after he moved out. At no point during the dependency did he take responsibility for that failure, instead blaming mother and

14

believing he had done nothing wrong.  Moreover, during the dependency, father's failure to act in a protective capacity continued.  During virtual visits from out of state, father tried to undermine the children's placement by telling them they had been kidnapped by their caretaker and encouraging them to misbehave.  When father visited California in June 2025, he prioritized a "surf event" over seeing his children in person for the first time since October 2023 and threatened to leave the state without seeing the children at all if he did not get unsupervised visits.  There is some evidence that even in September 2025, on the eve of the twelve-month review hearing, father was encouraging the children to make false allegations against the caretaker.  Father's continued failure to take responsibility for his role in the conditions that led to the dependency, together with his affirmative actions to undermine the children's stable foster care placement, is substantial evidence of a substantial risk of detriment, even setting aside concerns about the stability of father's housing situation.  Thus, father's reliance on authority holding that a detriment finding may not be based *solely* on a parent's inability to afford housing is misplaced.

For example, father quotes *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401-1402 for the proposition that "[p]roving substantial detriment cannot mean merely proving that a parent's living arrangement is less than ideal."  In that case, the juvenile court had found detriment based on the mother's "housing situation, citing [the child's] expressed fear, anxiety and unhappiness" about living in a long-term shelter for homeless families.  (*Id.* at p. 1401.)  The county welfare department, however, had found the shelter *was* "'appropriate'" housing, and the mother had been "having unsupervised

15

weekend visits at the shelter with no reported problems other than [the child's] dislike of the shelter and its residents." (*Ibid.*) Father never progressed to unsupervised in-person visits because he was unable to demonstrate he had obtained similarly safe and appropriate housing where unsupervised overnight or weekend visits could be conducted, and because he made himself available for in-person visits only late in the dependency.

Father interprets the court's acknowledgment of his bonds with the children and his efforts to get custody, together with its comment that if "he just had a nice four-bedroom house, things would be a lot different," as meaning that "the only issue that remained by the time of the 12-month review was father's housing." We view the court's comments differently. As discussed, father's housing circumstances were not the only, or even the most concerning, obstacle remaining to his taking custody of the children. The court recognized father's financial difficulties but emphasized that the "legal standard" drove its analysis. This simply is not a case where a parent has been separated from his children "merely because [he is] poor." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 792.) Father therefore has not demonstrated the juvenile court's detriment finding lacked the support of substantial evidence.

*B. Reasonable Services Finding*

Father argues the juvenile court's reasonable services finding is not supported by substantial evidence because the department failed to provide him with adequate housing assistance. We are not persuaded.

When a court orders reunification services, the department must ensure the services provided are reasonable.  (§ 361.5, subd. (a); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.)  Whether the reunification services offered were reasonable is judged according to the circumstances of each case.  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 691)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

The court's reasonable services finding "must be made upon clear and convincing evidence."  (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.)  We review the finding that reasonable services were provided or offered for substantial evidence.  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.)  "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)  In other words, "the question before a court reviewing a finding that a fact has been proved by clear and convincing evidence is not whether the appellate court itself regards the evidence as clear and convincing; it is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof."  (*Id.* at p. 1009.)

17

Here, there is substantial evidence father received reasonable housing services. In June 2025, the court authorized father to receive $3,500 in assistance towards first month's rent and security deposit if he qualified. By July 2025, shortly after father moved to California, the department had made the necessary referral and repeatedly explained to father how the housing assistance program worked. At the end of July 2025, the department learned father did not qualify for that program, but within days it had referred father to another program. There is no evidence of anything the department did that impeded father from benefiting from these programs, nor does he identify any specific things the department could have done, but failed to do, to assist him in obtaining adequate housing in California.

Father's arguments focus on purported failures to provide housing assistance earlier in the dependency, before he moved to California. For example, in his view, the department unreasonably delayed in helping him obtain the children's birth certificates, which he needed to obtain housing assistance in North Dakota. And he criticizes the department for this "delay," characterizing the assistance provided as "too little, too late." By father's own account, however, confirmed by the North Dakota agency's home study, he *had* appropriate housing in North Dakota, a two-bedroom apartment that was set up with bunkbeds for the children. The ICPC evaluation did not result in unqualified approval, but not because of any problem with father's housing, which raised no concerns. Instead, it was father's criminal record that caused the North Dakota agency to

recommend additional investigation and continuing supervision, and then father's move to California caused the ICPC evaluation to be withdrawn altogether.

Moreover, it was father's own decision to move to California in late June 2025, not any lack of housing assistance from the department, that left him "having to scramble to find housing in an unaffordable market" late in the dependency. The department referred father for housing assistance soon after he arrived in California, and when he was rejected for one program, it provided a new referral to another program within days. That is not "wait[ing] until the last possible moment to provide required services," as father would have it. It may well have been "too little, too late," but the fault for that circumstance was not the department's. Father's reliance on cases with different facts, in which the department was responsible for delays in providing services, is misplaced. (See, e.g., *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1242 ["Maintaining Mother on a waiting list was not equivalent to 'providing' or 'offering' services"]; *In re T.W.-1* (2017) 9 Cal.App.5th 339, 346 [department's case plan was delayed, failed to identify service providers or provide instructions to parent on how to enroll, and did not address many of the problems leading to removal].)

Father proposes that we infer the department's efforts to assist him in finding affordable housing must have been unreasonable from the fact of his failure to obtain such housing in California: "Affordable housing is admittedly a difficult problem to tackle, but where a parent is steadily employed and industrious, as Father was in this case, it is hard to believe the Department could not find a way to make it work." We

disagree. After his move to California, father briefly had a job he expected to be steady employment, but did not turn out to be, and he was unable to immediately replace it except with part-time work for minimal hours, supplemented with "small remodeling jobs" and making deliveries. Father's hustle is to be commended, but that is not steady employment. Also, father's move to California late in the dependency did not leave the department much time to "find a way to make it work" before the statutory timelines for reunification expired. The juvenile court was not compelled to make the inference father proposes.

Thus, father has not shown the juvenile court's reasonable services finding lacks the support of substantial evidence.

*C. Probability of Return Finding*

Father argues the juvenile court erred in finding there was no substantial probability the children would be returned to his custody within the statutory timeline. We find no error.

At a 12-month review hearing a court must return the child "unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) If the court does not return the child at the 12-month review hearing, "[t]he court shall continue the case only if it finds that there is a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home

20

within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (§ 366.21, subd. (g)(1).) To conclude that there is a substantial probability of return, the court must find (1) consistent visitation, (2) that the parent "has made significant progress in resolving problems that led to the child's removal," and (3) the parent "has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)-(C).) We review the juvenile court's finding there is no substantial probability of return for substantial evidence. (*Kevin R.*, *supra*, 191 Cal.App.4th at p. 688.)

Substantial evidence supports the juvenile court's finding that there was no substantial probability of return. Father's argument to the contrary rests on the premise that his "housing situation" was "the only obstacle remaining for placement," which we have already rejected. And there is little if any evidence father was on the verge of resolving even that issue. Moreover, at the time of the 12-month review hearing, which was held about 17 months after removal, there was little time remaining to address the remaining obstacles before the 18-month review hearing. There is no appropriate basis for us to disturb the juvenile court's determination.

### III.   DISPOSITION

The order terminating father's reunification services is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL                          
                                                                           J.

We concur:

MILLER                          
                        Acting P. J.

FIELDS                          
                                J.